## COMMONWEALTH *vs.* JAMES L. VICK.

Suffolk. March 5, 1980. — July 1, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Insanity. Homicide. Practice, Criminal,* Voluntariness of inculpatory statements. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Waiver.*

At a criminal trial, the judge erred in failing to submit to the jury, on his own motion, the issue whether certain inculpatory statements made by the defendant were the product of a rational intellect where there was substantial evidence of the defendant's insanity at the time he made those statements. [45-46]

INDICTMENTS found and returned in the Superior Court on April 19, 1978.

The cases were tried before *Brogna,* J.

*Sherrill P. Cline* for the defendant.

*Michael J. Traft,* Assistant District Attorney (*Matthew L. McGrath,* Legal Assistant to the District Attorney, with him) for the Commonwealth.

BRAUCHER, J. Pursuant to G. L. c. 278, §§ 33A-33G, the defendant appeals from convictions of murder in the first degree of Johnnie Vick, his brother, of assault and battery with a dangerous weapon on Robert Vicks, his uncle, and of unlawful possession of a handgun. There was substantially no dispute that he shot and killed his brother and shot his uncle, and the principal issue at his trial was his criminal responsibility. But inculpatory statements made by him while in custody, bearing on deliberate premeditation as well as on sanity, were admitted in evidence. We hold that the judge's failure, on his own motion, to submit to the jury the issue whether those statements were the product of a rational intellect requires reversal of the convictions.

There was evidence tending to prove the following facts. The defendant lived in a third floor apartment in a building in Dorchester owned by his uncle. The uncle lived in a first floor apartment and the defendant's brother lived in a second floor apartment. On the morning of Tuesday, December 26, 1977, the defendant entered the building, greeted his uncle and brother, and went up to his apartment. Some time later, in his brother's apartment, the defendant shot his brother three times, killing him. The uncle then got into a car in the driveway, and the defendant went out on the porch and shot his uncle through the windshield, hitting him in the hand.

The prospect of a defense of insanity was fully disclosed in the opening statement to the jury on behalf of the defendant, and the defendant's uncle testified at length to irrational behavior of the defendant during several months preceding the shooting. Thereafter the prosecutor called the defendant's parole officer as a witness, and the parole officer testified to the following. The day after the shooting the defendant called the witness, and the witness and three others went to an apartment where the defendant was staying and took him to a police station. The defendant was booked, given Miranda warnings, and asked if he wished to say anything. He said he would rather talk to his attorney, and the police waited for the attorney to appear. The witness sat next to him and "chatted" with him throughout. At some point the defendant said, "You can only take so much. It was bound to happen." The defendant also said he and his uncle did not get along too well; there was continuous harassment about his not paying his rent. There was no objection or exception to this testimony.

Subsequently, the prosecutor called as a witness another parole officer who had conducted a preliminary parole revocation hearing on January 3, 1978, about a week after the shooting. After a voir dire hearing, the judge found that the defendant "knowingly and intelligently waived his Miranda rights and decided on his own and with advice of counsel to go ahead with the hearing," and permitted the

hearing officer to testify before the jury. At the hearing, according to the testimony, the defendant said that his uncle was bothering him because he hadn't paid rent, that he was having serious difficulties with his relatives and had to sleep in a motel in Saugus, and that on December 26, 1977, he got in his car at the motel, saw a gun on the seat, pushed it over and drove to the Dorchester apartment. At that point the defendant's lawyer told him not to say more, and the hearing ended. The witness testified that the defendant appeared "to be kind of spaced out" at the hearing.

There was other testimony that the defendant had not had any difficulties with his uncle or brother, that there was no rent problem, and that he had spent the night of December 25, 1977, in an apartment in Mattapan. Thus the defendant's statements could be thought to be consistent with his detachment from reality. On the other hand, those statements could be understood to provide significant evidence of motive and deliberate premeditation.

Where a conviction rests significantly on a full-fledged confession by the defendant and there is testimony making out a substantial claim of involuntariness, we have held that the judge on his own motion should order a hearing on the issue of voluntariness, rule that the confession is voluntary before allowing its consideration by the jury, and submit the issue of voluntariness to the jury for reconsideration. *Commonwealth* v. *Harris,* 371 Mass. 462, 469-474 (1976). We have in recent years questioned whether the same safeguards might not be required for inculpatory statements which fall short of a confession. See *Commonwealth* v. *Garcia,* 379 Mass. 422, 432-434 (1980), and cases cited. There is authority that, if the trial judge has before him substantial evidence of the defendant's insanity at the time of his statements, even spontaneous inculpatory statements by a defendant while in custody are inadmissible unless it appears from the record "with unmistakable clarity" that the judge considered whether the statements were "the product of a rational intellect." *Eisen* v. *Picard,* 452 F.2d 860, 863-865 (1st Cir. 1971), cert. denied, 406 U.S. 950 (1972). The

present record makes no such showing, but the main evidence of the defendant's insanity was not introduced until after the evidence of the defendant's statements. We therefore pass the question whether there was error in the admission of the statements in evidence. See *Commonwealth* v. *Masskow,* 362 Mass. 662, 666-668 (1972).

We have recently reversed several convictions because of error in failure to submit to the jury the issue whether a "confession" was the product of a rational intellect. *Commonwealth* v. *Cole,* 380 Mass. 30, 40 (1980). *Commonwealth* v. *Chung,* 378 Mass. 451, 456-459 (1979). Cf. *Commonwealth* v. *Johnston,* 373 Mass. 21, 25 (1977) (error to exclude psychiatric testimony). In the *Cole* case the "confession" was no more damaging to the defendant than the statements in issue in the present case. See 380 Mass. at 33 n.6. By the end of the trial there was substantial evidence of the defendant's insanity at the time he made those statements. We hold that the voluntariness of those statements should have been submitted to the jury on the judge's own motion. We do not consider the question whether the statements could instead have been admitted only for the limited purpose of assessing the defendant's criminal responsibility. See 380 Mass. at 41 n.14; *Commonwealth* v. *Williams,* 379 Mass. 600, 605 (1980).

Other issues presented are unlikely to arise in the same way at a new trial.

*Judgments reversed.*

*Verdicts set aside.*